We'll move to our third case this morning, and that is See v. Illinois Gaming Board. I think we have everyone now. Mr. Baker, you may proceed. Good morning, Your Honor. May it please the Court and Counsel? My name is John Baker, and I represent the appellant, Christopher See. Mr. See was employed by the Illinois Gaming Board as a sworn law enforcement officer. His responsibilities were, he worked at a dock site for one of the, what used to be boats, but one of the gaming sites in the state of Illinois. He was a sworn officer, as I mentioned. Christopher See filed a very lengthy grievance with his employer. The grievance itself was about 60 pages in length, and it outlined a lot of concerns that he had, cited to a lot of legal authority. I'm not sure that it was all controlling legal authority, but he did outline that. In his grievance, he specifically said he was doing this as a citizen and not pursuant to his job responsibilities. But one of the things, and the primary takeaway from that, was he was concerned about corruption. Corruption between the Illinois Gaming Board and the Illinois State Police. The Illinois State Police is very involved in the Gaming Board. They staff a good number of the people in the Gaming Board, are actually employees of the Illinois State Police. See was concerned about this and thought that there was some corruption that was involved and cited to a history of things. Shortly after he filed that grievance, he had a couple of conversations with an individual by the name of Francisco Sposiri. Mr. Sposiri was a high-ranking member of the Gaming Board administration. He was one of the top people. He was also an Illinois State Police officer. So, Mr. Becker, can I ask you, jumping ahead in this sequence, the defendants say that the actions that they took, which were basically the fitness exam, were taken not because of the complaint, but because of behaviors that they were finding troubling. As a sworn officer, Mr. See could carry a weapon. I'm reluctant to micromanage an employer's ability to follow up on concerns such as the ones they articulated. And I guess you would have to show that they were pretextual somehow, and I'm not sure how you would do that. Well, thank you, Judge Wood, and I agree. Particularly, this court has, I think, ruled multiple times that there is a heightened standard there for a law enforcement officer and that employers do have a reason to be more concerned when it comes to them. But what I would say in establishing that it is pretextual, and I disagree that that was what they reached as a decision, but even more importantly, I believe that it creates a question of fact and not something that can be resolved through summary judgment. And I suppose, Judge, that the most important thing to look at is the actual letter that was written that directed Mr. See to go on his administrative leave and to have his fitness for duty. And it's about a paragraph, but it says, specifically, you have expressed concerns that the Illinois State Police may try and send someone to physically harm your family due to the filing of a grievance. And Mr. See disputes that that ever happened. He denied that that ever happened. And so what we have here is we have this question of fact as to whether that is a good faith basis. Don't I recall from the record that Mr. See, at some point, does say, you know, given his background, as I recall, you know, from the Marines to various other law enforcement positions, he wasn't personally frightened, but he says, I think my wife is concerned about the ISP. This is something that I, because I love my wife. These were bizarre kinds of things to say and might have made a rational person think, let's just make sure he's OK, which, of course, he turns out to be OK. And they put him back on the job, right? Well, Judge, I disagree with the assertion. I think that, yes, there are legitimate reasons why they can inquire. But the fact that Chris See's wife is concerned is in no way attributable to him. You know, that again, that requires him to be responsible for the feelings of his wife. And so, yes, his wife does have some concerns. And he did say, yes, my wife was concerned, but that's not necessarily him. I don't think that these are. But it's a concern of his. The state of mind of the people who ordered the exam is that he is, in fact, afraid that the ISP might send someone to harm his family, not him in particular, but most people care about their families. And if that's a good faith concern on the part of the defendants, then they can order the exam. Well, I don't think those are the facts. I think the fact is that he said, my wife is concerned about this. He didn't say he personally was concerned about it. So I think it's different. He's not saying, I'm concerned that they're going to harm my wife. He never suggested that. What he said was, my wife has expressed concern to me that they might harm her or our family. That's what he said, which is, which I think is a far cry from saying I am personally concerned. But we also get back to the idea of a pretextual statement, Your Honor, because, again, in the statement itself of why he is going to be placed on the leave, Maziri specifically says he's being placed on leave because you said you were concerned for your family's safety. And that's not what he said. That is not. That's not at all what he said. And Dr. Killian, in his report, he even said he was a doctor. But does somebody else have to read it the way you are? Maybe in his head that wasn't what he was trying to say. But we are asking, objectively, was there reason to order this exam? And could a rational listener have drawn the inference that they drew? Well, I don't believe that they could. But, again, I believe that that's a question for a jury. I mean, could a rational. Pretext is all the time assessed at the summary judgment stage in employment cases. So we need a little bit more than that. It's about pretext. Well, I mean, it's very clear that but for his actually preparing this memo, this grievance, that this never would have happened. After he prepares the meeting memo, there are a couple of conversations. He expresses that there is corruption. And we can go through and we can read, and it's cited in my brief, what Sposiri is saying about this. And he says, I know personally, and it bothered Sposiri, that he said that he suggested that the Illinois State Police had some corruption. That bothered Sposiri. So when you look at that, we have to look at what is the question, what motivates the finder of fact? Or, excuse me, what motivates the employer here? And I think that there is plenty of evidence when we take a look at it just from the timing. The fact that the evidence, in my view, does not support what Sposiri says is the basis for why he is doing this. And the fact that Sposiri is continually saying, look, I am concerned that he is talking about corruption. And so that is the concern. And I do believe that, you know, that is sufficient from which a jury, this is presented to a jury for a jury to make a decision. Not something that should be decided at summary judgment. Now, if a jury decided that way, certainly they would be able to draw those inferences. But I think they could look at the totality of the evidence that we have outlined and draw exactly the opposite conclusion. That that was the reason. And again, you know, and even if we were to go back and say my family is concerned, that is a very, very minimal statement. And the concern that I have with that is any time an employer, you are essentially taking the standard of what is necessary to seek out a fitness for duty evaluation. And not just a fitness for duty evaluation, a psychiatric fitness for duty evaluation. Something that, you know, it stands with you. Not only was it a fitness for duty evaluation, but he had to disclose all of his medical records to the psychiatrist. It was clear that all of that information was to be shared with the department. So all of that information, this wasn't just a yes or no, thumbs up, thumbs down sort of thing from the psychiatrist. And so all to have that power to say, well, we think you might be crazy, we're going to send you. There's just not sufficient evidence to show that there's a business necessity. And I do understand that there is a lower threshold when it comes to law enforcement. And there should be. I'm not disputing that at all. But that doesn't mean that there is no threshold. There has to be an A threshold. And as the ADA puts it, there has to be a business necessity. And I think based upon the facts that we have outlined here, we established that there is a question of fact as to whether there is that business necessity. And that's what I think is very important here. And that's why we're asking that the court reverse this so that a jury can make that determination. And I think a jury is perfectly reasonable or it's perfectly reasonable for a jury to be able to make that decision, to listen to what Sposiri says and see if Sposiri is really saying the truth. Because if not, an employer can come up with almost any justification in order to support their decision that they are going to send somebody for a psychiatric evaluation. And clearly that was not a concern. I mean, the psychiatrist's report was very clear here. There were not these issues. But it does create a significant issue. I do notice that my time is winding down and I just want to see if there are any additional questions beforehand. Thank you. Thank you. Mr. Griffiths. Thank you, Your Honor. May it please the court. Assistant Attorney General Carson Griffiths on behalf of defendants. I'd like to begin with the issue of pretext and specifically Mr. Baker's assertion that there's a dispute of fact regarding whether Mr. C said that he was afraid or his wife was afraid. And Judge Wood, I think you really got to the heart of the issue here in that defendants weren't required to sort of parse the words of the emails directly. If you read those emails in context, those four emails that Mr. C sent in a less than 24-hour period of time, they expressed escalating concerns and raised bizarre allegations of unspecified retaliation, corruption, and other issues. And defendants weren't really required to wait and see what happened before sending him to a fitness for duty evaluation based on those emails. And this court doesn't second guess that sort of business judgment about whether somebody needs to have their mental health assessed, especially in the context of public safety officers like Mr. C. I'd also note that I fear, I being Mr. C, fear retaliation from the Illinois State Police. He also discussed the fact that Richard Gasiorski, the individual who allegedly was spreading these rumors, kept pictures of dead bodies in his office and had been bragging about his corruption as a Chicago police officer. All these connoting that Mr. C was afraid that Mr. Gasiorski might do something. And also defendants were presented with comments from Mr. Gasiorski and C's other colleagues that they were afraid he might act out at work. And I know in Mr. C's reply brief, he asserts that that information came after the decision was made to put him on leave. And I would just like to note that if you read Fred Sesco's series deposition, it's clear that he knew of those comments by Mr. C's colleagues before the decision was made before August 9th. And so with that in his mind, there's this background of conflict between Mr. C and his colleagues. And then these concerning comments that Mr. C shows up unannounced to the casino while he's supposed to be on leave or excuse me, on vacation. And in those circumstances, there's just really no evidence to show that their concerns weren't genuine. So Mr. Griffiths, can I ask you just a tiny technical question? How does Mr. Bazziri spell his last name? It keeps flopping back and forth. Your Honor, it's two Z's and two R's. Two Z's and two R's. All right. That's what we're going to do then. Yes, there's some discrepancy in the record. I'd also like to note that this doesn't resemble the cases that Mr. C cites in his brief, where this court has found a question, in fact, as a pretext, such as Valentino or Hopgood, where you have, you know, shifting explanations, suspicious investigations, or some sort of differential treatment between C. It was not unusual for gaming board special agents to be sent for, or Illinois State Police troopers for that matter, to be sent for fitness for duty evaluations. Defendants presented evidence of other individuals being sent for such evaluations. And also, the collective bargaining agreement, which a portion of is in the record, specifically envisions that the gaming board would have the ability to send special agents to fitness for duty examinations when they have reason to suspect their fitness might be compromised. Are there privacy protections for officers who were sent for such an examination? Yes, Your Honor. It's not as though defendants can simply disclose that information to anyone. I'm not sure exactly what those privacy protections are in detail, nor are they in the record. But there's also no evidence, on the other hand, that, you know, the gaming board or Spizzeri or Ms. Weathers were disseminating any of the conclusions from Dr. Killian, which, as you pointed out, she was sent for duty, in fact. I'd also briefly like to address Mr. C's ADA claim. And this court has made clear in Kaufman and other cases, that in the context of public safety agencies like the gaming board, psychiatric examinations are job-related and consistent with a business necessity if they perceive an officer to be even mildly paranoid, hostile, or oppositional. And here, again, Mr. C is an armed gaming special agent. He plainly exhibited some paranoid thoughts and hostility towards his colleagues, specifically the colleagues employed by the Illinois State Police. And so, again, defendants were required to wait and see if Mr. C actually acted out or there was an escalation of that conflict before ensuring that he could safely perform his duties. So is it your position that the genesis of all this, the corruption allegations, are just beside the point, or what role do they play? Well, the corruption allegations— I mean, this is serious, of course. Right. The corruption allegations were not in any way the basis for Mr. Spizzeri's decision to place Mr. C on leave. You know, he clarified that grievances are common, and, in fact, grievances on this issue of favoring Illinois State Police troopers were common, and that didn't concern him. He was concerned that Mr. C was capable of performing his duties. With respect to the allegations of corruption directed to Mr. Gasiorski, who C said was spreading these false rumors about his family, I'd like to note that there is evidence in the record that Mr. Spizzeri looked into those allegations after Mr. C returned from leave. Specifically, there was an email discussing an interview between Mr. C and some other special agents where Mr. C got defensive and Mr. Spizzeri clarified during his deposition, we were trying to look into the things that Mr. C was talking about, and he didn't want us to. So, this is, you know, not a circumstance where defendants totally disregarded what Mr. C was claiming. They just wanted to make sure that, given his escalating and strange behavior, that he could perform his duties safely. Mr. Griffith, are you maintaining your argument that this grievance is not protected speech? It's not a matter of public concern? Not an appeal, Your Honor, we're not. That was an argument raised below for the case law. Generally, an individual speaking in the context of being a union representative like Mr. C, that speech would be protected. And we thought, you know, given the record before us, the legitimate justification offered by defendants, as well as the fact that Mr. C didn't really suffer any adverse consequences as a result of his being sent for a fitness for duty examination, that those were sufficient bases to affirm the district court's judgment. To clarify, you're not maintaining an argument that this speech was within the scope of agencies' official duties? Correct. And therefore, it's not actionable as a First Amendment claim? You're dropping that argument? We are dropping that argument, Your Honor. But as I mentioned, you know, there are other bases on which to affirm the district court's judgment. So unless this court has any additional questions for those reasons and the reasons stated in our brief, we'd ask that you affirm the district court's judgment. Thank you. Thank you very much. Anything further, Mr. Baker? You're still muted, Mr. Baker. Mr. Baker, you're on mute. I apologize, Judge Sykes. I'm sorry about that. If I could just have a few seconds to address two points. Number one, this suggestion that Mr. C somehow showed up at work when he was on vacation and this instigated it just simply isn't true. The decision had been made to place Mr. C on the leave of absence before that ever occurred, factually. So that's just not there. The evidence by Gazorski, you know, we asked specifically over and over what were the concerns, what were the concerns. Spazzeri could never point to any specific concerns. So this is a factual issue. The other thing that I want to point out, the suggestion that Mr. Spazzeri was not concerned about the suggestion of corruption at the ISP is certainly belied by his own testimony. I asked him when he made that comment that there was corruption, did that offend you? He said it was concerning to me. Answer, why was that concerning? Answer, because it didn't make sense with what I believed and what I knew. And then he went on to say, I know there is no corruption at the ISP. I look at these and I say a jury can make a reasonable conclusion that this was not a legitimate decision on the basis from the defendants. So I thank you and ask that the court reverse and remand this matter back to the district court. Thank you. Thank you very much. And our thanks to both counsel. The case is taken under advice.